# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| **MENG-JUNG HO,** | |
| **Petitioner,** | |
| **v.** | **Case No. 20 C 6681** |
| **ELIZABETH CATHERINE HO,** | **Magistrate Judge Beth W. Jantz** |
| **Respondent.** | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Petitioner Meng-Jung "Morris" Ho has filed a petition against his wife, Respondent Elizabeth Catherine Ho, seeking the return of the parties' minor son, E.W.H. ("the child"), to New Zealand, under the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (Oct. 25, 1980) (the "Convention"), implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq*. As relevant here, the Convention provides that a parent whose child has been wrongfully removed or retained in the United States may petition for the child's return to his or her country of habitual residence.

The Petition was filed on November 10, 2020, but the parties did not consent to the jurisdiction of the United States Magistrate Judge, 28 U.S.C. § 636(c), until March 8, 2021. By agreement of the parties and as required by the Convention, the Court then set an agreed, expedited discovery and pretrial schedule, which

culminated in a 4-day bench trial before the Court in late June 2021.[1]  This Memorandum Opinion and Order sets forth the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52.

For the reasons below, the Court concludes that the child was a habitual resident of New Zealand at the time of the wrongful retention in the United States, Petitioner had and was exercising custody rights under New Zealand law, and the "grave risk" exception was not established in this case.

## I.     Standard of Decision

Where, as here, an action is "tried on the facts without a jury," Rule 52 requires the Court to "find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P 52(a); *see also Khan v. Fatima*, 680 F.3d 781, 785 (7th Cir. 2012) ("The trier of fact must decide whom to believe (and how much to believe) on the basis of the coherence and plausibility of the contestants' testimony, corroboration or contradiction by other witnesses, and other clues [as] to falsity and veracity.").  The Court must "explain the grounds" of its decision and otherwise demonstrate a "reasoned, articulate adjudication."  *Aprin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008).

Here, in adjudicating Petitioner's claim, the Court has considered the totality of the evidence presented at trial.  The Court has carefully considered the weight to be accorded the evidence, including the credibility of each witness.  In assessing

---

[1] The parties also agreed that Petitioner's requests for preliminary and final relief would be tried together in this single bench trial, [dkt. 22], and that some witnesses would testify in person and some witnesses would testify remotely by video.

credibility, the Court had the opportunity to observe[2] and has considered, among other things, each witness' demeanor and facial expressions; intelligence; ability and opportunity to see, hear, or know the matters about which the witness testified; memory; potential for bias; and the believability of the witness' testimony in light of the other evidence presented. *See, e.g., Anderson v. City of Bessemer, N.C.,* 470 U.S. 564 (1985) (applying the well-settled principle that the trial judge is in the best position to assess witness credibility).

The Court has additionally considered the parties' arguments, including in several pretrial briefs [dkts. 50, 53, 54, 57], and the applicable law. This decision on the merits incorporates the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

## II. The Standard for Evidentiary Rulings

Under 22 U.S.C. §9005, any documents submitted with a petition seeking relief under the Hague Convention or any documents "provided after" the petition's submission which "relate[ ] to" the petition require no authentication in order to be admissible in court. In this District, for example, other judges have allowed foreign custody court documents and excerpts of foreign law to be admitted without being authenticated. *See, e.g., Guerrero v. Oliveros*, 119 F. Supp. 3d 894, 907 & n.4 (N.D. Ill. 2015); *In re Interest of Zarate*, No. 96 C 50394, 1996 WL 734613, at *2

---

[2] Three of the four witnesses at trial, Petitioner Morris Ho, Respondent Elizabeth Ho, and Respondent's sister, Amy Karlstedt, all testified live in the courtroom. The fourth witness, one of Petitioner Ho's bosses, Graham Brain, testified via video from New Zealand.

(N.D. Ill. Dec. 23, 1996). Accordingly, the Court did not reject any proffered exhibits on the grounds that they had not been authenticated, and neither party objected to this practice.

The Court did, however, apply the Federal Rules of Evidence—as most other courts have done in this context—in order to determine what documents and other evidence was admissible and for what purposes. *See, e.g., Schwartz v. Hinnendael*, No. 20-C-1028, 2020 WL 3531564, at *2 (E.D. Wis. Sept. 15, 2020) (determining in a Hague Convention case whether expert was admissible under Federal Rule of Evidence 702); *Luedtke v. Luedtke-Thomsen*, No. 1:12-cv-750-WTL-TAB, 2012 WL 2562405, at *1 (S.D. Ind. June 29, 2012) (stating that Federal Rules of Evidence apply to petition hearings).

## III. Findings of Fact[3]

Petitioner is 41 years of age and employed as a hardware design engineer with Fusion Electronics ("Garmin New Zealand"), a subsidiary of Garmin. Petitioner is a citizen of Taiwan and a permanent resident of New Zealand, owns real property in New Zealand, and has family in Taiwan and the United States. Respondent is 31 years of age, owns real property in New Zealand, is a permanent resident of New Zealand and a citizen of the United States, and has family in the United States.

---

[3] Some of these findings of fact were agreed to by the parties on the record during the pretrial conference held on June 22, 2021; others were found by this Court following trial.

The parties were married on July 27, 2013, in the United States. (Pet. Ex. 4.)[4] Around 2013 or 2014, Petitioner obtained permanent residence in the United States based on the marriage. (Res. Ex. 1.) Petitioner's U.S. re-entry permit expired on March 26, 2019, and he never renewed it. (Pet. Ex. 16; Tr. 06/28/2021 at 11:58–12:00.)

The parties resided in the United States until 2016, when Petitioner accepted employment with Garmin New Zealand, located in Auckland, New Zealand. Respondent started a graduate program in New Zealand in February 2017. (Tr. 06/29/2021 at 4:38–4:42.) Since 2016 to the present, Petitioner has remained employed with Garmin New Zealand. Respondent finished her physical graduate studies in February 2018, and formally graduated in December 2018 after receipt of her grades. (*Id.*) Respondent testified that she viewed their move to New Zealand as just "temporary" for her graduate school studies. (*Id.*) The parties resided continuously in New Zealand from 2016 until Respondent came to the United States in June 2020 with their child but without Petitioner (more facts on that below).

The parties filed U.S. income tax returns for 2016 and 2017. (Res. Exs. 43, 45, 47.) Respondent attempted in 2020 to prepare U.S. income tax returns for 2018 and 2019 for late filing, but there was no evidence that those were ever filed.

---

[4] In the interest of issuing an expedited decision for the parties, transcript cites to only rough transcripts from the trial were available as of the issuance of this opinion. These transcripts are cited as (Tr. [date] at [time]). Petitioner's exhibits are cited as (Pet. Ex. __.), and Respondent's exhibits are cited as (Res. Ex. __.).

(Pet. Ex. 92 at 118, 154–56; Pet. Ex. 134.)  Respondent filed a U.S. income tax return for 2020, but did not list her spouse, Petitioner.  (Pet. Ex. 137.)

On October 5, 2018, the parties' only child, E.W.H., was born in New Zealand. Petitioner was present in New Zealand for the birth of the child, and is listed as the child's father on the birth certificate, (Pet. Ex. 21).  Until the time of the child's travel from New Zealand to the United States in June 2020 with Respondent, Petitioner lived with and cared for the child on a daily basis in New Zealand.  The child had only travelled twice in his life outside of New Zealand.  (Tr. 06/28/2021 at 11:23–11:24.)  The child received regular medical care in New Zealand through its national medical service since the time of his birth until his travel to the United States in June 2020.  Respondent also had medical insurance in New Zealand.

The parties purchased the marital residence located at 83 Cobham Crescent, Kelston, Auckland, New Zealand in mid-2018.  (Pet. Ex. 40–41.)  The marital residence is secured by a mortgage note in the names of both parties.  (Pet. Exs. 40–45.)

Petitioner applied for jobs in the United States in 2018 and early 2019, (Res. Exs. 5–19), and conceded it was their plan to move to the United States at that time, (Tr. 06/28/2021 at 4:15).  Petitioner also testified that he was making these applications to make his wife "happy," including attending an in-person interview with Google in Chicago in February 2019 (he was not offered that job). (Tr. 06/29/2021 at 11:25–11:29.)

In March 2019, Petitioner applied for and accepted a position with Garmin United States in Kansas. In anticipation of changing positions, Petitioner provided notice to his employer, Garmin New Zealand. The parties ultimately decided to remain in New Zealand, however. Petitioner turned down via email on March 14, 2019, the Garmin United States' job offer. (Resp. Ex. 19; Pet. Ex. 64.) Written communications between the parties at that time record that Respondent was in agreement for Petitioner to turn down the U.S. job, at least at that time. This is reflected by Respondent's negative comments in emails about moving to Kansas, (Res. Ex. 17), and helping Petitioner to draft the email to Garmin United States rejecting its job offer, (Pet. Ex. 102). Petitioner testified that the reasons they gave to Garmin United States ("high cost of moving" and the "short time frame" they had to move) were only half-truths, which is corroborated by Garmin offering to accommodate a later start date, but Petitioner still turned down the job. (Tr. 06/28/2021 at 4:35–4:37; Res. Ex. 19; Pet. Ex. 64.) Petitioner continued to work at Garmin New Zealand after that, through the present.

Following Petitioner turning down this job offer in the United States, the couple went with one of Petitioner's bosses in New Zealand, Mr. Graham Brain, and his Garmin team to lunch in New Zealand around mid-March 2019, to thank the team (a) for helping Petitioner to get the United States job, and (b) for understanding that the couple had "changed their mind" and Petitioner wanted to remain at his Garmin job in New Zealand. (Tr. 06/28/2021 at 3:21–3:27; Tr. 6/30/2021 at 10:44–10:46.) Mr. Brain, Petitioner's boss, did not have a

recollection of exactly what Respondent said during this lunch. (Tr. 06/28/2021 at 3:28.) Respondent, on the other hand, testified that she was surprised that this was the point of the lunch once she arrived, (Tr. 06/30/2021 at 10:44–10:46), but Respondent's testimony on this point was called into doubt given that she had helped Petitioner to draft the rejection email to Garmin United States.

Shortly after rejection of the Kansas job, in late March 2019, Respondent obtained a New Zealand driver's license for the first time since moving there several years earlier. (Tr. 06/29/2021 at 1:55–1:56.) Also in late March 2019, the parties obtained quotes to ship Respondent's sister's dog, Frankie, to New Zealand. (Pet. Exs. 126–128.) Respondent admitted that she offered to have her twin sister and the dog come live with her and Petitioner in New Zealand around this time, (Tr. 06/29/2021 at 1:58–2:17), and this is documented by a lot of communications that spring and early summer 2019 between Respondent and her sister about such potential plans, (Pet. Ex. 100).

Around that same time, Respondent created a video audition for a New Zealand television show, the "Great Kiwi Bake Off," in which Respondent presented that she "now calls New Zealand her home," and referred to the child by a nickname that suggested he was a New Zealander ("kiwi pavlova"). (Pet. Exs. 104, 111.) The Court recognizes these lines could have been just puffery by Respondent to get on the show, but it is nevertheless part of the family's continued presence in New Zealand.

The following month, on April 13, 2019, the parties signed cell phone contracts for New Zealand service that ran for 24- and 36- month periods respectively. (Pet. Exs. 59–60.) Respondent had New Zealand service on her cell phone until approximately July 2020.

Throughout 2019 and the first half of 2020, the family was involved in activities in New Zealand, including some kids' recreational classes and Respondent's improv, theater and writing groups. (Pet. Ex. 72.) Respondent also held what appeared to be several part-time jobs during her time in New Zealand. (*Id.*) Respondent continued her at least weekly involvement in improv group activities in New Zealand through June 13, 2020, (Pet. Ex. 92), just five days before her travel to the United States with the child. Petitioner also presented a couple of versions of Respondent's CV that included a New Zealand phone number and her sister's phone number as her U.S. phone number, and listed several of Respondent's activities and work experiences in New Zealand (although it was not clear that any of these CV versions were ever actually submitted to any potential employers). (Pet. Exs. 66–68.) The child did not have any play dates in New Zealand nor go to any schools or daycares there. Respondent also testified that during 2019, the family was still investigating possibly moving out of New Zealand to Australia or Canada, including her interest in pursuing a Ph.D. program in Canada. (Tr. 06/30/2021 at 10:49–10:54.)

As of March 2020, Petitioner testified that the parties were having significant marital issues, and that he wanted to try to save his marriage, so he started

applying for United States and Canadian jobs again through Indeed.com and Garmin Canada (Res. Exs. 24–38), in order to try to make his wife "happy." (Tr. 06/28/2021 at 2:18–2:24.)  In April 2020,[5] Petitioner communicated with a U.S.-based immigration attorney, William McLean, about possibly renewing Petitioner's "green card" for the United States, representing that he was "currently actively looking for a new position in the United States."  (Res. Ex. 23.)  There was no evidence, however, that Petitioner ever filed for an "SB-1 returning resident visa," a new "green card," or anything else that would allow for him to have legal status in the United States at that time.  (*Id*.)

In May and June 2020, Respondent was chatting with her sister on a repeated basis about (a) Respondent finding a job in Chicagoland, and (b) renting an apartment in Chicago, but there was no evidence that either her or Petitioner secured in the U.S. a job or a place to live.  Respondent also told her sister that she was going to hide her and the child's passports from Petitioner.

In early June 2020, the parties started to research couples' therapists based in New Zealand.  The parties actually scheduled a therapy session for June 16, just two days before Respondent's and the child's trip to the United States. (Pet. Ex. 92.)

---

[5] The testimony and pretrial briefs suggested in some cases that Petitioner's communication with attorney McLean took place in 2019 rather than 2020, but the Court finds that it most likely took place in 2020, as Respondent's Exhibit 23 includes the copyright mark, "LinkedIn Corporation 2020," in addition to other contextual clues pointing to 2020.  In any case, the conclusions below would not be affected whether the communication took place in 2019 or 2020.

On June 18, 2020, Respondent and the child traveled on round-trip tickets from New Zealand to Chicago, via Los Angeles, for a one-month trip. Respondent and the child had tickets to return to New Zealand on July 17, 2020, via Los Angeles, arriving in New Zealand on July 19, 2020 via Air New Zealand. Respondent did not bring much luggage: as she characterized it, "two suitcases, a carry-on, and a giant purse." (Tr. 06/29/2021 at 3:16.) In chats between the parties prior to the trip, Petitioner worried and speculated to Respondent that she might not come back from the United States with their child, despite her denials of leaving permanently. (Pet. Ex. 92.) Respondent testified that it was "originally" her intent to come back from the United States trip to New Zealand on July 17, 2020, as their round-trip tickets provided, but that "had changed after a while." (Tr. 06/29/2021 at 3:16.)

Indeed, in July 2020, Respondent had several communications with her sister that reflects that Respondent had changed her mind, intended to remain in the United States with the child, and was worried about Petitioner finding out about her plan to remain in the United States. (Pet. Ex. 100). For example, on July 1, Respondent stated to her sister, "I'm freaking out and counting down the days until it's obvious what's going on." (*Id.*) On July 11, Respondent wrote to her sister that she was "[p]retty much gonna have to barter" to get the family dog, Mocha, to the United States: "Like either [Petitioner] send[s] her [the dog] or he doesn't video chat us [Respondent and the child] at all." (*Id.*) At the time of their return flight to New Zealand, Respondent told Petitioner that she didn't get on the return flight

because her "temperature was high" and she needed to wait for the results of her Covid-19 test before rebooking. (Pet. Ex. 92.) About the same time, however, Respondent told her sister, "Well shit is going down RN with me and morros [sic]." (Pet. Ex. 100.) Whereas in Respondent's testimony, she gave other reasons for not getting on the return flight, testifying that she didn't return to New Zealand because the couple was "talking about moving to Canada. And also [she] didn't want to go back to New Zealand with [their] son and be put through [Petitioner's] abuse again." (Tr. 06/30/2021 at 11:05.) Respondent never rebooked their return flight to New Zealand and remained with the child in the United States, and Petitioner remained in New Zealand.

Meanwhile, back in New Zealand in June and July 2020, Petitioner was looking for business and investment opportunities there. (Pet. Ex. 100.) Respondent testified that she told Petitioner that she did not think they could afford such investment plans, (Tr. 06/29/2021 at 3:26–3:27), as opposed to, "I thought we were moving?" During that same time period, Petitioner also continued to investigate jobs in Canada, including with Garmin Canada. (Res. Exs. 36–39.) Petitioner admitted during his testimony that he was lying to Respondent about being willing to move to Canada and sending their dog, Mocha, to the United States, in the hope of getting her and the child back to New Zealand. (Tr. 06/28/2021 at 5:25–5:30.) This is corroborated by his chats with Respondent during this time period, in which he seems to condition moving to Canada on the pair returning to New Zealand first. (Pet. Ex. 92; Res. Exs. 37–39.) The family's

dog was never shipped out of New Zealand, nor were any plans ever finalized to do so.

Respondent testified to several examples of what she alleged was abuse by Petitioner. According to her testimony, Petitioner (1) threatened to watch her through a webcam, (2) dangled their child over a 25-foot ledge and laughed about it, (3) in February or March 2020, scalded the child with hot tea and refused to take him to a doctor, (4) in March 2020, locked Respondent and the child out of the house for 10 or 20 minutes, (5) tracked Respondent using the GPS on her phone, (6) in May 2020, hit Respondent in the head at a K-Mart, (7) in May 2020, told Respondent she was useless to him after giving birth to the child and started talking about camping in remote areas, (8) in 2010, when they met, raped Respondent, and (9) threatened to take the child to Taiwan where Respondent would not be able to find him. (Tr. 06/30/2021 at 11:05–11:13.)

Respondent testified about few details as to each alleged incident. The most details were provided about Petitioner locking Respondent and the child out of their house for 10 or 20 minutes and the incident at the K-Mart. (*Id.*) With regard to the K-Mart incident, Respondent wrote to her sister at the time that she was "bending down to get the bottle from the cart in Kmart and [Petitioner] took off the carrier and as he did that he smacked [her] hard in the head." (Pet. Ex. 100.) In her sworn affidavit to a later emergency order of protection (more details on that below), Respondent swore that she "leaned down to pick an item off the shelf and

13

[Petitioner] took his left hand and whacked [her] over the head so hard [she] saw stars] and that her "head throbbed for days after." (Res. Am. Ex. 41.)

On October 13, 2020, approximately four months after arriving in the United States without Petitioner, Respondent filed in the Circuit Court of Cook County a petition for an *ex parte* emergency order of protection against Petitioner, which was granted by the Circuit Court on October 14. (Resp. Am. Ex. 41.) Petitioner was served by mail to his New Zealand address with this order of protection, but never appeared in court in the United States on it.

In her sworn affidavit in support of the order of protection, Respondent stated that she and Petitioner "separated in or around June 2020" and that she "moved with [their] son to Chicago on or about June 18, 2020" from New Zealand, in order to escape Petitioner's abuse and threats. (*Id*.) With regard to Petitioner's alleged abusive behavior, she swore to the following: Petitioner (1) threatened "on numerous occasions" both in person and over video chat to take the child to Taiwan where Respondent would not be able to locate them because she does not speak Chinese, (2) threatened in early June 2020 to watch Respondent through a webcam without her knowledge, (3) dangled the child over a 25-foot ledge in June or July 2019 and laughed about it, (4) in March 2020, locked Respondent and the child out of their house for 10 minutes, (5) has tracked Respondent using the GPS on her phone and their "Chinese roommates," (6) on June 13, 2020, at a K-Mart, when she "leaned down to pick an item off the shelf [Petitioner] took his left hand and whacked me over the head so hard I saw stars," (7) in May 2020, threatened to put

14

the child into daycare, told Respondent she was "useless" to him after giving birth to the child, and started talking about camping in remote areas, (8) has been emotionally and psychologically abusive, including not talking to her for weeks at a time, and (9) "sexually assaulted [her] in broad daylight, next to a church." (Res. Am. Ex. 41.)

On November 10, 2020, Petitioner filed a petition with the District Court in the Northern District of Illinois seeking the return of the child, E.W.H., to New Zealand. [Dkt. 1, Petition.] The parties consented to the jurisdiction of the Magistrate Judge on March 8, 2021. Following an agreed, expedited discovery and pretrial schedule, this Court held a bench trial in late June 2021.

## IV.    Conclusions of Law

### A. Legal Framework

The Hague Convention, a treaty to which both the United States and New Zealand are signatories,[6] was adopted "[t]o address the problem of international child abductions during domestic disputes," and its core premise is that "the interests of children . . . in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (internal quotation marks and citation omitted). The Convention's return requirement is a "'provisional' remedy that fixes the forum

---

[6] *See United States Hague Convention Treaty Partners*, U.S. Department of State—Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (visited July 12, 2021).

for custody proceedings." *Id.*  Accordingly, a Hague Convention case is not a child custody case, and the merits of the child custody case are to be reserved for the courts in the country of the child's habitual residence.  *Id*. at 723, 727.

"The central question in any petition seeking the return of a child under the Hague Convention and ICARA is whether the child who is the subject of the petition has been 'wrongfully' removed or retained within the meaning of the Convention." *Redmond v. Redmond*, 724 F.3d 729, 737 (7th Cir. 2013).  Under the Convention, a removal or retention is wrongful where (a) "it is in breach of rights of custody attributed to a person, an institution[,] or any other body, either jointly or alone, under the law of the State [b] in which the child was habitually resident immediately before the removal or retention"; and [c] "at the time of removal or retention[,] those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."  Hague Convention, art. 3. Petitioner concedes these are the three elements which he has the burden to establish by a preponderance of the evidence.  22 U.S.C. § 9003(e)(1).  If Petitioner establishes a wrongful removal or retention, the burden shifts to Respondent to show that one of the exceptions to the return requirement applies.  22 U.S.C. § 9003(e)(2).  In this case, Respondent asserts that the applicable exception is set forth in Article 13b of the Convention, which provides that a child's return is not required if a respondent establishes that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Hague Convention, art. 13b.  Respondent must

establish this exception by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). The Court will address Petitioner's underlying claim and Respondent's affirmative defense in turn below.

Before delving into an analysis of the elements of Petitioner's claim, the Court first determines *when* the alleged wrongful removal or retention occurred, as the Convention frames the relevant timeframe for "habitual residence" as "immediately before" the wrongful removal or retention. Hague Convention, art. 3. Respondent testified that it was "originally" her intent to come back from the United States trip to New Zealand on July 17, 2020, as the round-trip ticket provided, and that only "had changed after a while." (Tr. 06/29/2021 at 3:16.) Petitioner agreed to let Respondent take the child to the United States in part after seeing that Respondent had booked return flights for her and the child for July 17, 2020, and did not otherwise object to the one-month trip. (Pet. Ex. 92.) Accordingly, when Respondent left New Zealand with the child in June 2020, she was removing the child with Petitioner's permission, and it was not in breach of his custody rights. *See* Hague Convention, art. 3.

The failure to return as planned on July 17, 2020, coupled with Respondent's testimony that she had changed her mind and decided to stay in the United States sometime after her arrival in June 2020, establishes when the previously authorized trip turned into a wrongful retention. Accordingly, the Court finds that

Respondent retained the child in the United States as of July 17, 2020.[7]  As a

practical matter, given the close timing however, the Court would reach the same

conclusions it draws below even if the earlier removal on June 18, 2020, was

wrongful.

### B. Petitioner's *Prima Facie* Case

### 1. Habitual Residence (Element #1)

The primary dispute in this case centers on the child's habitual residence

"immediately before the removal or retention."  Hague Convention, art. 3.

Petitioner asserted that New Zealand is the child's habitual residence, while

Respondent contended in her closing argument that, alternatively, the child has no

habitual residence because the parties had no shared intent on where to live

long-term, or the parties' intent was to relocate from New Zealand to the

United States or Canada.

The Convention itself does not define "habitual residence."  *Monasky*,

140 S. Ct. at 726.  But relatively recently last year, the Supreme Court in *Monasky*

gave guidance on what courts should consider in identifying a child's habitual

residence.  Interpreting the statute's plain language, the Supreme Court explained

that "[a] child 'resides' where [he] lives," and that a residence is habitual only when

it is "more than transitory," which will be necessarily fact specific.  *Id.*  Further, the

Supreme Court stated that the Convention's explanatory report and the treaty's

---

[7]  Respondent has not argued that any later date should be viewed as the date of the
allegedly wrongful removal or retention.

negotiation and drafting history also confirm a fact-based approach and that, for a residence to be habitual, "some degree of integration by the child in a social and family environment" is required. *Id.* (internal quotation marks and citation omitted). Overall, the place "where a child is at home, at the time of removal or retention," is the child's habitual residence. *Id.* Determining a child's habitual residence is a "fact-driven inquiry" that will "depend[] on the specific circumstances of the particular case." *Id.* at 727. As the Supreme Court elaborated,

> [b]ecause locating a child's home is a fact-driven inquiry, courts must be "sensitive to the unique circumstances of the case and informed by common sense." *Redmond*, 724 F.3d at 744. For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant. Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations. **No single fact, however, is dispositive across all cases.** Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence. But suppose, for instance, that an infant lived in a country only because a caregiving parent had been coerced into remaining there. Those circumstances should figure in the calculus. *See Karkkainen*, 445 F.3d at 291 ("The inquiry into a child's habitual residence is a fact-intensive determination that cannot be reduced to a predetermined formula and necessarily varies with the circumstances of each case.").

*Id.* (emphasis added).

In *Monasky*, the Supreme Court acknowledged that Courts of Appeals had emphasized different factors in determining a child's habitual residence, with some preferring to focus on acclimatization, others placing greater weight on the parents' shared intentions, and some rejecting any rigid formula. *Id.* at 725–26. Ultimately, the Supreme Court did not explicitly endorse or reject any lower court's approach.

Instead, it concluded that the "bottom line" was that "there are no categorical requirements for establishing a child's habitual residence—least of all an actual-agreement requirement for infants." *Id.* at 728. Therefore, as instructed by the Supreme Court, this Court determines the child's habitual residence by considering the "totality of the circumstances." *Id.* at 723.

At the outset, the Court notes that the child was approximately 1 year and 9 months old at the time he is alleged to have been wrongfully retained by Respondent in the United States; he is currently 2 years and 9 months old. Where an infant is born or is physically present is not wholly dispositive of his habitual residence, however. *See id.* at 729 ("An infant's 'mere physical presence' . . . is not a dispositive indicator of an infant's habitual residence.")

Given the child's age at the time of the wrongful retention, acclimatization also has limited weight in this particular case. This is because as a practical matter at less than two years of age, the child would not yet have had an ability to acclimate to any residence independent of his parents. *See id.* at 727 (distinguishing between acclimatization of "older children capable of acclimating to their surroundings" versus children "too young or otherwise unable to acclimate"); *Redmond*, 724 F.3d at 746 (recognizing that "the concept of acclimatization has little meaning" for very young children); *see also Larbie v. Larbie*, 690 F.3d 295, 310 (5th Cir. 2012) (explaining that when a child is young, "he or she cannot possibly decide the issue of residency," and relying on an English case involving a 2.5 year

old), *abrogation on other grounds recognized by Smith v. Smith*, 976 F.3d 558, 561 (5th Cir. 2020).

The parties' shared intent is a factor that this Court considers.  In a case of alleged wrongful retention, such as this case, a court determines a child's habitual residence in part "by asking whether a prior place of residence . . . was effectively abandoned and a new residence established . . . by the shared actions and intent of the parents coupled with the passage of time." *Walker v. Walker,* 701 F.3d 1110, 1119 (7th Cir. 2012) (citing *Norinder v. Fuentes*, 657 F.3d 526, 534 (7th Cir. 2011)) (internal quotation marks omitted).  Because parents often dispute their intentions during the litigation, "the court should look at actions as well as declarations in determining whether the parents shared an intent to abandon a prior habitual residence." *Walker,* 701 F.3d at 119 (internal quotation marks omitted); *see also Norinder,* 657 F.3d at 534 ("Often parents will not agree about what their shared intentions were once litigation is underway, and so we must take account of the parents' actions as well as what they say.").  In other words, weight is to be placed upon what the parties actually did and decided together leading up to the retention, rather than just their post-hoc representations during the litigation.

In this case, the family made their home continuously in New Zealand since 2016, purchased a home there in mid-2018, welcomed their baby into that home when he was born in October 2018, and participated in community activities such as Respondent's improv group. *See, e.g., Monasky*, 140 S. Ct. at 729 ("[A] wide range of facts . . . including facts indicating that the parents have made their home

in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being "'habitual.'") The Court further concludes, based on the findings of fact above, that the parties considered moving out of New Zealand on and off while living there from 2016 to 2020 (including Petitioner's attempts to get a job in the United States), but never actually executed on any definitive plans to move from New Zealand, despite wishes by Respondent to do so. *See, e.g., Norinder,* 657 F.3d at 534 ("That [the parties] thought that they might one day return to the United States does not mean that the United States remained the child's habitual residence.")

Furthermore, the Court concludes that the parties did not have a shared intent to abandon their residence in New Zealand and to establish a new residence in the United States at the time of Respondent's retention of the child in July 2020. *See Walker v. Walker,* 701 F.3d at 1119. This is evidenced by several findings of fact, as follows. The marital residence, the bulk of the family's possessions, and the family's dog remained in New Zealand, as did Petitioner himself. (Pet. Ex. 92.) Petitioner had communicated in April 2020 with an immigration attorney about possibly renewing his "green card" for the United States, (Res. Ex. 23), but he never actually filed for anything that would have allowed for him to have legal status in the United States. The parties had not secured jobs nor a place of their own to live in the United States. The Court found credible Respondent's ***own*** intention of wanting to establish a residence in the United States. But the Court found equally credible Petitioner's intention of wanting to maintain their residence in New

Zealand.  *See, e.g., Grano v. Martin*, 443 F. Supp. 3d 510, 536 (S.D.N.Y. 2020), *aff'd*, 821 F. App'x 26 (2d Cir. 2020) (recognizing that "***if only one party*** has a conditional intent to relocate, and the other party does not, 'it cannot be said the parents shared an intent'") (emphasis added).

This lack of a shared intent to abandon New Zealand is further corroborated by the parties' intent regarding the trip to the United States in June 2020, which was originally intended even by Respondent as only an extended visit.  For instance, Respondent did not bring much luggage, as Respondent characterized it, "two suitcases, a carry-on, and a giant purse."  (Tr. 06/29/2021 at 3:16.)  Respondent further testified that it was indeed "originally" her intent to come back from the United States trip to New Zealand on July 17, 2020, as the round-trip tickets provided, and that only "had changed after a while."  (Tr. 06/29/2021 at 3:16.) *Cf. Walker*, 701 F.3d at 1120 ("While parts of [Respondent's] testimony thus show that the couple might have been considering relocating to the United States, this is a perilously thin basis for inferring that their trip in 2010 was truly intended to be the start of that permanent move.")

Indeed, to the contrary, there was significant evidence, as detailed above in the findings of fact, of Respondent's concealment of and anxiety over her plans to remain in the United States once she was there with the child in July 2020, including the inconsistent stories she gave to her sister, to Petitioner, and then to this Court during testimony about her reason for not taking her booked return flight to New Zealand on July 17, 2020.  All of this reflects that, while Respondent

wanted to remain in the United States, she would have had to go against Petitioner's wishes to do so, and that there was therefore no shared intent between the parties for the child to remain and reside in the United States. In short, Respondent's attempted concealment of her plans would not have been necessary had they had a shared intent to abandon New Zealand.

As one of her alternative arguments—and relying primarily on *Kijowska v. Haines*, 463 F.3d 583, 589 (7th Cir. 2006), a pre-*Monasky* case—Respondent contended in her closing that Petitioner had not met his burden to establish New Zealand as the child's habitual residence, because the parties never shared an intent about where they would live long-term: "[i]f it turns out that the parties had *no* shared intent, then there is no habitual residence and [Petitioner] loses. . . . so the only way that [Petitioner] can prevail here is to show that the parties had a shared intent to live in New Zealand." (Tr. 07/01/21 at 10:42.) And to the contrary, Respondent argued, she always planned to move back to the United States, regardless of Petitioner's intent. (*Id*. at 10:42–10:43.)

Respondent's argument was squarely rejected by the Supreme Court in *Monasky*, however. In that case, the Supreme Court considered whether another country could qualify as a child's "habitual residence" in the absence of an actual agreement between the parents on where to raise their child. 140 S. Ct. at 723, 726. Rather, the Supreme Court held that a child's habitual residence depends on the "totality of the circumstances" specific to the case, and that an actual agreement between the parents is ***not*** necessary to establish a young child's habitual

residence.  *Id.*  Indeed, the Supreme Court forcefully explained that the "bottom line" is that "there are no categorical requirements for establishing a child's habitual residence—least of all an actual-agreement requirement for infants." *Id.* at 728.  The Supreme Court further explained that a contrary position would undermine the Convention:

> An actual-agreement requirement would enable a parent, by withholding agreement, unilaterally to block any finding of habitual residence for an infant. If adopted, the requirement would undermine the Convention's aim to stop unilateral decisions to remove children across international borders. Moreover, when parents' relations are acrimonious, as is often the case in controversies arising under the Convention, agreement can hardly be expected. In short, as the Court of Appeals observed below, "Monasky's approach would create a presumption of no habitual residence for infants, leaving the population most vulnerable to abduction the least protected." 907 F.3d at 410.

*Id.; see also Smith v. Smith*, 976 F.3d 558, 561 n.1 (5th Cir. 2020) ("In light of the Supreme Court's holding in *Monasky* that a child's habitual residence should be determined by looking to the totality of the circumstances, to the extent that our circuit's prior caselaw . . . has prioritized the parents' shared intent over other factors, we overrule that emphasis."); *Grano*, 443 F. Supp. 3d at 535 (recognizing that the Supreme Court in *Monasky* has "mostly undone the no-habitual-residence line of cases stemming from a lack of shared parental intent, at least for infants," as it indicated that relying on agreement of the parents alone would leave many infants without habitual residences, undermining the purpose of the Hague Convention).

Furthermore, even assuming that *Kijowska* was not abrogated by *Monasky*, it is nonetheless inapposite.  In *Kijowska*, the Court recognized the lack of shared

intent of the parties, as they were estranged from the time of the child's birth, but nonetheless determined that the 2-month-old child still did have a habitual residence. *Kijowska,* 463 F.3d at 587–89. The Court merely opined that it could "assume," as an alternative argument, that the child had no habitual residence at the time of removal, which would in any case lead to the same result in that case. *Id.* at 589. And even the central facts of this case are different than *Kijowska,* because the parties here were not estranged since the child's birth; rather, they lived together in New Zealand from the time of the child's birth in October 2018 until the June 2020 trip to the United States.

This Court also takes guidance from other courts that have reached similar conclusions based on similar facts. An illustrative case is *Walker v. Walker*, No. 11 C 2967, 2013 WL 1110876, at *3–7 (N.D. Ill. March 16, 2013), in which, following a reversal and remand of an earlier contrary decision, the Court found Australia, not the United States, to be the subject children's habitual residence. In that case, the parents first intended to remain in Australia only temporarily, but remained past that time, and eventually settled in Australia. *Id.* The mother and children later took an extended trip to the United States, which their mother claimed was intended to be a prelude to a move back to the U.S., while their father's life was still based in Australia. *Id.* The Court found that based on this fact pattern, the parties had no shared intention to abandon Australia and to establish residence in the United States. *Id.*

For all of the reasons above, the Court concludes that Petitioner has carried his burden that New Zealand was the habitual residence of the child "immediately before" the retention.  Hague Convention, art. 3.

## 2.  Custody Rights (Elements #2 and #3)

A removal or retention is only "wrongful" under the Hague Convention if it is in violation of a petitioner's "rights of custody," which "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Abbott v. Abbott*, 560 U.S. 1, 9 (2010) (internal quotation marks omitted).  This is the second element for which Petitioner has the burden.  The Court consults the law of the country of habitual residence in order to determine a petitioner's rights of custody.  *See id.* at 10; *Norinder*, 657 F.3d at 533.

The third and final element is that, at the time of the removal or retention, a petitioner must have been actually exercising those custody rights or would have been exercising them if not for the removal or retention.  Hague Convention, art. 3(b).  "The standard for finding that a parent was exercising his custody rights is a liberal one, and courts will generally find exercise whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child."  *Walker*, 701 F.3d at 1121 (internal quotation marks and citation omitted).

Petitioner has asserted that he has custody rights under New Zealand law, specifically the Care of Children Act 2004 (the "Act"), and given that he is listed as the child's father on the birth certificate.  Petitioner further asserts that he was

exercising those custody rights by living with and therefore seeing and caring for the child daily since his birth and up until Respondent left with the child in June 2020. It is Petitioner's burden to prove these two custodial elements, but the Court also notes that Respondent did not challenge either of these elements as a factual or legal matter.

Pursuant to Article 14 of the Hague Convention and 22 U.S.C. § 9005, the Court takes judicial notice of New Zealand's Act. *See, e.g., Guerrero*, 119 F. Supp. 3d at 907 & n.4. Section 17 of the Act provides that the father and mother of a child are joint guardians where, as here, they were married at the time of the child's birth. Pursuant to Section 16 of the Act, as joint guardians of the child, both Petitioner and Respondent "must act jointly" in exercising "the duties, powers, rights, and responsibilities of a guardian," which include "changes to the child's place of residence." From a plain reading of this Act, Petitioner had rights in relation to the child's care, including the right to determine jointly with Respondent where the child would live. Thus, Petitioner had the necessary "rights of custody" over the child. *See Abbott*, 560 U.S. at 9.

Further, Petitioner has established that he was exercising those custody rights. Before Respondent took the child from New Zealand to the United States without Petitioner in June 2020, Petitioner had lived with and was caring for the child on a daily basis. (Tr. 06/29/2021 at 11:50–11:53.) Even while Respondent and the child were in the United States in June and July 2020, Petitioner repeatedly asked Respondent questions about their son and asked to see him, with Respondent

testifying that Petitioner "spoke to [the child] every day" via video chat during this time period.  (Tr. 06/29/2021 at 11:53.)  This evidence establishes that Petitioner was actively exercising his rights of custody of the child as of the wrongful retention.

Accordingly, the Court finds that, as of the time of the wrongful retention, Petitioner had "rights of custody" as to the child, and he was exercising those rights by remaining in regular and daily contact with his child.

### 3.  Respondent's Affirmative Defense—Grave Risk

"Article 13(b) of the Convention and [22 U.S.C. §9003(e)(2)(A)] provide that when a respondent demonstrates by clear and convincing evidence that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation, the automatic return required by the Convention should not go forward."  *Norinder*, 657 F.3d at 534. Given the concern with comity among nations, the defense must be interpreted narrowly.  *Van De Sande v. Van De Sande*, 431 F.3d 567, 571–72 (7th Cir. 2005). "Because the [federal] court in this sort of case is responsible for determining which country's courts should adjudicate the domestic dispute and not resolving the dispute itself, we have stressed that the risk of harm must truly be grave." *Norinder*, 657 F.3d at 535.  "The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes." *Van De Sande*, 431 F.3d at 570.

As an initial matter, Respondent contended that her allegations of abuse against Petitioner are uncontroverted because Petitioner did not specifically rebut all of them during his testimony, but this would improperly shift the burden. Respondent bears the burden to establish by clear and convincing evidence that the child faces a grave risk. *See* 22 U.S.C. § 9003(e)(2)(A). The Court does not find Petitioner's lack of testimony on each one of these allegations to be indicative of their veracity, particularly given that Petitioner has contested application of the "grave risk" exception throughout this litigation.

The Court concludes that Respondent has not carried her high burden to establish a "grave risk" exception, for two principal reasons. First, other evidence—including, for some alleged incidents, the lack of other evidence—presented by Respondent calls into question the veracity of her testimony about these alleged incidents. Respondent presented no photos, police reports, or medical reports of injury, for example. *See, e.g., Uzoh v. Uzoh*, No. 11-CV-09124, 2012 WL 1565345, at *6 (N.D. Ill. May 2, 2012) (concluding that respondent's contested acts of domestic violence were not credible, where she did not document any resulting injuries, never sought law enforcement intervention, or complained to a social services agency).

With respect to the alleged rape of Respondent by Petitioner, when Ms. Karlstedt, Respondent's twin sister, was asked during the trial whether Respondent had ever told her that Petitioner had raped her, Ms. Karlstedt testified that she didn't know and couldn't recall. (Tr. 06/30/2021 at 4:03–4:05.) This was a

very curious response and called into question the veracity of Respondent's claim, given the documented closeness of the sisters' relationship. Ms. Karlstedt had testified that their relationship was very close, (Tr. 06/30/2021 at 4:03–4:05), and Respondent described that it was "kind of a competition between her [sister] and [her] son at the moment" for who is closest to her, (Tr. 6/29/21 at 1:41).

With respect to another one of the alleged incidents, Petitioner hitting Respondent in the head at a K-Mart, Respondent presented two versions of the story, one in communications with her sister and one in the affidavit attached to the application for an order of protection. (Pet. Ex. 100; Res. Ex. Am. 41.) Looking at the unfiltered and contemporaneous of the two versions, with her sister, Respondent explains that Petitioner was taking a carrier off of Respondent when she was struck in the head, which sounds more like an accident than Petitioner using his "left hand" to intentionally "whack" her over the head. (*Id.*)

Although the Court has considered the contents of the emergency order of protection as one factor in determining the veracity of Respondent's allegations now, the Court places no special weight in its analysis on the fact that such an order was entered. *See, e.g., Grano*, 443 F. Supp. 3d at 531, 541–45 (noting an order of protection in the findings of fact, but not emphasizing it in determining whether grave risk was established).

Moreover, even assuming that all of Respondent's allegations of abuse are true, they still would not constitute "grave risk" to the child, as it is narrowly defined in this legal context. *Norinder*, 657 F.3d at 534. Respondent's allegations,

when taken together, do not rise to a pattern of abuse that warrants in this particular legal context the Court finding by clear and convincing evidence a grave risk to the child from witnessing or being subject to such alleged threats and physical incidents. *See, e.g., Estrada v. Salas-Perez*, No. 12 C 1016, 2012 WL 4503147, at *11 (N.D. Ill. Sept. 28, 2012) (determining grave risk not established where there were a "handful of physical episodes," and collecting cases); *cf. Van De Sande*, 431 F.3d at 570–72 (remanding for an evidentiary hearing after summary judgment ruling, based on issue of grave risk where petitioner frequently physically and verbally abused respondent on multiple instances in front of the children and had threatened to kill the whole family).

As a final matter, Respondent has asserted that Petitioner threatened on several occasions in 2020 to take the child to Taiwan, where Respondent would have difficulty finding him. (Tr. 06/30/2021 at 11:12–11:13; Res. Am. Ex. 41.) Respondent did not develop this argument in her closing argument or pretrial briefing regarding these alleged threats, however, [dkt. 57 at 6]. The Court notes that, upon its own research, this Court has identified at least one Circuit that concluded that the prospect that a parent may lose custody of a child, including through flight to another country, does not necessarily constitute a grave risk to a child under the Convention. *See Souratgar v. Lee*, 720 F.3d 96, 106–107 (2d Cir. 2013). And, even if it could qualify as a "grave risk," there was nothing presented by Respondent other than her own testimony to establish such threats.

Based on all of the foregoing, Respondent has not met the "demanding standard" of proof required to establish that there would be a "grave risk" to returning the child to New Zealand. *Norinder*, 657 F.3d at 535.

## Conclusion

For the foregoing reasons, the Court finds that Petitioner met his burden to show that Respondent wrongfully retained the child in the United States, and that Respondent did not meet her burden of establishing the "grave risk" defense under Article 13 of the Convention. Accordingly, the Court finds that the child must be returned to New Zealand, and grants the Petition for return of the child, [dkt. 1].

This decision is neither easy nor lightly arrived at. The Court realizes that there are no true winners in this case and that the child will need appropriate care and supervision to make this transition. Counsel for the parties are directed to meet and confer by July 19, 2021 about reasonable conditions and timing for the effectuation of this decision. By July 19, 2021, the parties shall email a proposed order to this Court's proposed order inbox effectuating this ruling (specific as to time, manner, and date of return, and who is responsible for arranging and paying for the logistics of the child's return). The Court has allowed this approximate one-week time period to avoid any abrupt transition for the child. In accordance with this Court's prior orders, counsel for Respondent shall not release the child's passport from his possession until further order of this Court.

A telephonic hearing is set for July 22, 2021, at 11:15 a.m., for entry of a final order implementing this decision. The issue of Petitioner's request for costs [dkt. 1

at 10], 22 U.S.C. § 9007(b)(3), will also be addressed during that hearing. The parties shall be prepared for prompt compliance with this decision, as required by the Hague Convention.

E N T E R:

Dated: July 12, 2021

BETH W. JANTZ
United States Magistrate Judge